362 So.2d 58 (1978)
Muriel LUTGERT, Appellant,
v.
Raymond L. LUTGERT, Appellee.
No. 77-2055.
District Court of Appeal of Florida, Second District.
August 2, 1978.
Rehearing Denied September 14, 1978.
*59 Robert C. Ward, Miami Beach, and Marion E. Sibley of Sibley, Giblin, Levenson & Glaser, Miami Beach, for appellant.
Julian Clarkson of Holland & Knight, Fort Myers, and Vega, Brown & Nichols, Naples, for appellee.
DANAHY, Judge.
On this second appeal in a dissolution of marriage proceeding, the wife protests her award of alimony as inappropriate and inadequate. We agree in part and reverse.
The husband initiated these proceedings after a marriage of almost ten years duration. He had been married once before; she, twice. There are no children of the marriage. Insofar as the husband's financial obligations to the wife are concerned, the husband relied on the terms of an antenuptial agreement which limited the wife to the sum of $1,000 per month alimony in the event of divorce. The wife challenged the validity of that agreement and it was upheld by the trial judge. On appeal, this court reversed in an opinion by Judge McNulty. Lutgert v. Lutgert, 338 So.2d 1111 (Fla. 2d DCA 1976).
*60 On remand the trial judge was faced with the task of determining the amount of alimony to be awarded to the wife. We must assume that in doing so, he followed the primary criteria applicable to this case in determining an award of alimony; that is, the husband's ability to pay and the needs of the wife, taking into consideration the parties' shared standard of living during the marriage. Sisson v. Sisson, 336 So.2d 1129 (Fla. 1976).[1] The trial judge awarded the wife $75,000 in lump sum alimony, plus the sum of $4,000 rehabilitative alimony for a period of 24 months. After reviewing that award in the light of the record before us, we conclude that the award of rehabilitative rather than permanent alimony was in error, and the amount per month is inadequate.
Considering first the standard of living enjoyed by these parties during their marriage, we need only quote the following from the prior opinion of this court:
After the marriage, as may be gleaned from the admitted wealth of the husband the parties enjoyed a lifestyle reserved only to the fabulously rich. While the trial court found that during the times material herein the husband was worth from approximately $3,100,000 at the beginning to $3,900,000 at the present time, the wife points to much of the record tending to the conclusion that he is really presently worth nearer to $25,000,000. Indeed the admitted opulent lifestyle would appear to be supportable only if the latter figure were found to be the fact. For example, the present homeplace in Naples, Florida, is a palatial mansion directly on the Gulf of Mexico. It has eight bedrooms, twelve baths, a five-car garage, a guest house and servants' quarters and is surrounded by some four and a half acres of formal gardens with a gate house at its entrance. The parties owned at least three luxury motor yachts, one of them a 50-footer custom built in North Carolina, and one a 63-footer custom built in Japan. They at one time owned a private turbojet airplane. They drove only luxury cars, including Rolls Royces and Lincoln Continentals. They took at least one round-the-world cruise and several extended cruises to Europe and other parts of the world. They had staffs of servants and gardeners. He gave expensive gifts of valuable jewelry. The husband has a hobby of collecting classic automobiles, his present collection having a value in excess of $900,000; and on one occasion he bid for and purchased an original Duesenberg automobile for some $207,000. Lutgert v. Lutgert, supra, at p. 1114.
We consider next the husband's ability to pay. The husband contends that the trial judge, in the original final judgment upholding the validity of the antenuptial agreement, made a finding of fact that the husband is worth $3,900,000. That is clearly not the case. The final judgment was devoted in large part to the trial judge's conclusions concerning the validity of the antenuptial agreement. In considering whether there was a full and frank disclosure to the wife of the husband's worth, the trial judge said "[t]he court has the benefit of statements of the financial condition of the husband on July 1, 1963 ($3,163,000) and again on September 30, 1974 ($3,915,929)." That reference did not amount to a finding of fact and we do not consider the language used by Judge McNulty in the prior opinion in this case as so stating.
Unfortunately, we do not have the benefit of an express finding by the trial judge as to the actual worth of the husband. The husband relied on a financial statement prepared by his certified public accountant showing a net worth of approximately $3,900,000. The statement revealed that a substantial amount of the husband's assets consists of his ownership interest in some six corporations. In two of these corporations *61 the husband owns 99.8% of the outstanding shares of stock; in the other four, he owns 96% of the outstanding stock. The statement reflected, and the accountant testified, that the investments in these corporations were shown on the statement at book value. The accountant testified further that the assets of some of these corporations consist of interests in various partnerships, also shown at book value. Thus the husband's business interests are reflected in a somewhat complicated structure of corporations and partnerships.
Real estate investments comprise the bulk of the assets included in that financial structure. Evidence adduced by the wife established that, using the current fair market value of those investments, rather than book value, the net value of the husband's various corporate interests is greatly in excess of $3,900,000; indeed, as Judge McNulty said, much of the record tends to the conclusion that the husband is really worth closer to $25,000,000. While the husband's income appears modest in comparison to the evidence as to the extent of his wealth, we note that he followed the custom of having much of the amenities of his life supplied by his corporations. For example, his corporations owned the yachts, the airplane, the classic automobiles, and the expensive automobiles which he and the wife drove. Furthermore, the evidence showed that the husband's corporations enjoyed substantial cash profits. We are of the opinion that the husband's ability to pay is not appropriately measured by his income alone. See McCloskey v. McCloskey, 359 So.2d 494 (Fla. 4th DCA 1978).
We turn now to a consideration of the wife's situation. She is over 50 years of age and has not been employed in some thirty years. Her employment experience thirty years ago was limited. She was a fashion model but that was not her support. She worked in a dress shop for four or five months at a small salary. She and a friend operated a charm school for teenagers which was not lucrative. She worked as an errand girl in a law office; she cashed checks and sold merchandise for a chemical company.
After the marriage of these parties, when they moved to Florida, the wife obtained a real estate salesman's license. The wife testified that she obtained the license in order to understand her husband's real estate ventures. She further testified that the license was hung in the office of one of her husband's companies. That company paid her a salary of $600 per month (which, of course, is no longer available to her), but she did not work there as a real estate salesman. She has made some real estate investments on her own behalf. However, the wife has never used her salesman's license and there is nothing in the record leading to the conclusion that in two years the wife can support herself in the style to which she is accustomed through her efforts in real estate sales.
We hold that it was an abuse of discretion to award rehabilitative alimony rather than permanent alimony under these circumstances. Lash v. Lash, 307 So.2d 241 (Fla. 2d DCA 1975). If the wife, despite her age and lack of business experience, should achieve success in the real estate field or in some other career, that circumstance can be considered later as a basis for modification of the alimony award. McAllister v. McAllister, 345 So.2d 352 (Fla. 4th DCA 1977).
The husband makes much of the wife's separate assets. Those assets include jewelry given to her by the husband during the marriage valued at approximately $150,000, stocks and real property having a net value of approximately $60,000, and the marital home of the parties, which Judge McNulty described as "a palatial mansion directly on the Gulf of Mexico." The husband gave that residence to the wife during the marriage and he now contends that its value is at least $1,000,000, thus making the wife, in effect, a millionaire with the prospects of a millionaire's income. The record simply does not support that conclusion.[2]
*62 In the first place, one of the husband's corporations owns the east 415' of the property, which is the portion consisting of 4 1/2 acres of formal gardens. The five-car garage, guest house and gatehouse are located on that portion and the driveway to the house runs through that portion of the property. Although the husband testified that there was an "easement" affording access to the residence, he did not know whether his corporation had actually given a deed granting such an easement and the record discloses no recorded easement. The wife testified that she did not know what the value of the residence would be without inclusion of the formal gardens. Additionally, the husband's argument as to the value of the residence fails to take into consideration that the cost basis in the residence is relatively low (according to the husband's figures), and a sale for a substantial sum would produce a large income tax liability to the wife. Furthermore, the husband admits that it may take at least two years to find a buyer for the property. The parties introduced no evidence as to the value of the residence other than their own testimony. Under these circumstances, it appears to us that the net amount the wife might realize upon a sale of the residence is highly speculative at this time. We, therefore, feel that consideration of the marital residence as a substantial income producing asset of the wife should be given much less weight than the husband contends.
The wife's income from stocks and real estate is approximately $400 per month. That sum obviously will not go very far toward affording the wife some semblance of the lifestyle which she enjoyed during the marriage. And the wife cannot be compelled to consume her separate assets to maintain the style of living which she and the husband enjoyed. Gordon v. Gordon, 204 So.2d 734 (Fla. 3d DCA 1967). If, in the future, the wife's separate investments, including the sum which she may realize upon sale of the marital residence, should afford her a substantially greater income, this factor may be considered in any later review of alimony, along with any other material changes in the circumstances of the parties. In re Marriage of Jones, 357 So.2d 439 (Fla. 2d DCA 1978).
Finally, in assessing the wife's situation, we must take into consideration the wife's assertions in the record of the amount needed per month for her needs. In her initial pleadings, the wife asserted, and she has argued, that she needs the sum of $10,000 per month to maintain the standard of living which she enjoyed during the marriage. Nowhere is this amount itemized. In her financial affidavit, the wife stated that her monthly expenses during the marriage, exclusive of items pertaining to the marital residence and other expenses which were paid by the husband, amounted to $4,500 per month. She itemized these expenses. After remand of this case following the first appeal, the wife filed a pleading which asserted that the amount needed for her to continue to live in the home is $6,500 per month. That sum was itemized, and did not include costs of maintenance and repair of the residence. The husband disputes none of these figures.
We have already determined that permanent periodic alimony should be awarded in this case rather than rehabilitative alimony. Any amount of permanent periodic alimony will be taxable to the wife (and deductible by the husband). Taking note of that fact, it is clear that from an award of $4,000 per month, the net amount the wife will have available to live on would be closer to $30,000 per year than $48,000 per year. Manifestly, this would not sustain the wife in any semblance of the standard of living which she enjoyed during the marriage.
Based upon the record before us, we hold that it was an abuse of discretion to award the wife the sum of $4,000 per month alimony. An award of $6,500 per month is well within the ability of the husband to pay, as shown by the record in this case, and would meet the demonstrated need of the wife by providing her with a sum per month sufficient *63 to maintain a standard of living reasonably commensurate with that enjoyed by her during the marriage.
We fully realize that it is normally not our function to direct the trial judge as to the specific amount of an alimony award, but this is the second appeal in this case and the litigation has now been pending three and a half years. We believe such a direction to be appropriate here to terminate this lengthy and costly litigation. We, therefore, reverse with directions that the amount of alimony be increased to $6,500 per month and made permanent. McAllister v. McAllister, supra. We do not disturb the award of lump sum alimony.
We have carefully considered the wife's other two points on this appeal and find them to be without merit.
Reversed.
HOBSON, A.C.J., and BOARDMAN, J., concur.
NOTES
[1] We note that, although not applicable to this case, Ch. 78-339, Laws of Florida, which became effective June 19, 1978, lists specific factors which must be considered in determining an award of alimony. We believe the result reached here would be proper were this new law applicable to the case before us.
[2] While the wife's initial pleading alleges such a value in describing her very high standard of living during the marriage, subsequent developments in this prolonged litigation demonstrate she was not bound by that allegation.